# DEFENSE EXHIBITS



**BOARD OF GOVERNORS**
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D.C. 20551

DIVISION OF BANKING
SUPERVISION AND REGULATION

**SR 09--07**
**October 30, 2009**

**TO THE OFFICER IN CHARGE OF SUPERVISION AT EACH FEDERAL RESERVE BANK AND TO BANKING ORGANIZATIONS SUPERVISED BY THE FEDERAL RESERVE**

**SUBJECT: Prudent Commercial Real Estate Loan Workouts**

The Federal Reserve, along with the other financial regulators of the Federal Financial Institutions Examination Council (FFIEC),[1] has adopted the attached policy statement on *Prudent Commercial Real Estate Loan Workouts*. The Federal Reserve and the other financial regulators issued this policy statement to update longstanding guidance regarding the workout of CRE loans, especially in light of recent increases in such workouts. This guidance is intended to promote prudent CRE loan workouts at regulated financial institutions and to ensure examiners take a balanced and consistent approach in reviewing institutions' workout activities. If conducted in a reasonable and prudent manner, such workouts are often in the best interest of both the institution and the borrower.

Financial institutions that implement prudent loan workout arrangements after performing comprehensive reviews of borrowers' financial conditions will not be subject to criticism for engaging in these efforts, even if the restructured loans have weaknesses that result in adverse credit classifications. In addition, renewed or restructured loans to creditworthy borrowers on reasonable terms will not be subject to adverse classifications solely because the value of the underlying collateral declined.

The examiner's evaluation of a loan workout should be based upon the fundamentals of the particular loan, considering the project's current and stabilized cash flows, debt service capacity, guarantor support, and other factors relevant to the borrower's ability and willingness to repay the debt.

DEFENSE EXHIBIT
0528
1:15cr23 (RGA)

---

[1] The other financial regulators are the Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, Office of Thrift Supervision, and FFIEC State Liaison Committee.

Page 1 of 3

arrangements, classification of loans, and regulatory reporting and accounting considerations. The statement also includes references and materials related to regulatory reporting,[4] but it does not change existing regulatory reporting guidance provided in relevant interagency statements issued by the regulators or accounting requirements under generally accepted accounting principles (GAAP). These general principles also could apply to commercial loans that are secured by real property or other business assets of a commercial borrower.

Attachment 1 of this document contains examples of CRE loan workouts illustrating application of this statement to credit classification, determination of accrual versus nonaccrual status, and identification and reporting of troubled debt restructurings. Attachment 2 lists a summary of references to relevant supervisory and accounting guidance for real estate lending, appraisals, allowance for loan and lease losses (ALLL), restructured loans, fair value measurement, and regulatory reporting matters such as nonaccrual status. This statement should be used in conjunction with materials identified in Attachment 2 to reach appropriate conclusions regarding credit classification and regulatory reporting. Attachment 3 discusses valuation concepts for income producing real property.[5] Attachment 4 provides the classification definitions.

## II. Risk Management Elements for Loan Workout Programs

An institution's risk management practices for renewing and restructuring[6] CRE loans should be appropriate for the complexity and nature of its lending activity and should be consistent with safe and sound lending practices and relevant regulatory reporting requirements. These practices should address:

- Management infrastructure to identify, control, and manage the volume and complexity of the workout activity

- Documentation standards to verify the borrower's financial condition and collateral values

- Adequacy of management information systems and internal controls to identify and track loan performance and risk, including concentration risk

- Management's responsibility to ensure that the regulatory reports of the institution are consistent with regulatory reporting requirements (including GAAP) and supervisory guidance

- Effectiveness of loan collection procedures

---

[4] For banks, the FFIEC Consolidated Reports of Condition and Income (FFIEC Call Report); for savings associations, the Thrift Financial Report (TFR); and for credit unions, the NCUA 5300 Call Report.

[5] Valuation concepts applied to regulatory reporting processes also should be consistent with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 820, *Fair Value Measurements and Disclosures*.

[6] A restructuring involves a formal modification in the loan's terms with written and legally enforceable documentation.

To: Donovan, Jeffrey D[jddonovan@KPMG.com]
Cc: Delozier, Jason[jdelozier@kpmg.com]
From: Fean, Marian T.
Sent: Wed 12/9/2009 7:47:48 PM
Subject: Matured Loans Exception
Attachment B.1.10 - CORP-2009-028 - 10-1-2009.docx

Hi Jeff,

I have attached another Continuous Auditing Memo (CA Memo) regarding an exception noted. It is concerning the matured loans. If you need the listings of the matured loans referred to in the response, just let me know, and I will send them.

Please call with any questions or concerns.

Thank you.

*Marian T. Fean*

Senior Business & Control Analyst | Audit Services | Wilmington Trust Corporation

Maildrop 0470/WTC/2 | ( 302.651.8393 | Fax 302.651.8562

**This message was sent using TLS encryption technology.**

Visit our website at www.wilmingtontrust.com

Investment products are not insured by the FDIC or any other governmental agency, are not deposits of or other obligations of or guaranteed by Wilmington Trust or any other bank or entity, and are subject to risks, including a possible loss of the principal amount invested. This e-mail and any files transmitted with it may contain confidential and/or proprietary information. It is intended solely for the use of the individual or entity who is the intended recipient. Unauthorized use of this information is prohibited. If you have received this in error, please contact the sender by replying to this message and delete this material from any system it may be on.


DEFENSE EXHIBIT 1010 1 15cr23 (RGA)

KPMG-WT-SEC-E0064176

**WILMINGTON TRUST**

## Intra-Company Memorandum

| | | | |
|---|---|---|---|
| To: | Michael A. DiGregorio<br>Robert V.A. Harra<br>William B. North | Date: | December 9, 2009 |
| From: | Marian T. Fean | Subject: | Continuous Auditing Memo –<br>Matured Loans Accounting |
| Cc: | See Distribution List | | |

Audit Services continuous review of Commercial Loans, identified the following item that needs the attention of Management. An explanation of the issue process is included at the end of this memo.

If you have any questions or concerns, please contact me.

**Management needs to properly process and account for matured loans.** (Priority 2)

Through confirmation test work on commercial loans, we noted that some of the loans in the sample had maturity dates prior to the September 30, 2009 file date. The loans' maturities were from December 1, 2008 to September 9, 2009, with the majority of ratings at provisional pass or better. According to the Commercial Loan Non-accrual Policy, "On a monthly basis, Credit Risk Management reviews all loans reported past due 60 days or more with respect to principal and/or interest to determine the need to suspend interest accrual."...."Loans that have matured but remain current for interest and are in the process of extension and/or modification generally will not be placed on non-accrual unless future repayment ability is in jeopardy." However, these matured loans were not placed on non-accrual. While this process is not new, it should be noted that a formal SOX control was established around this process effective April 1, 2009.

To determine if the matured loans were in the process of extension, making them eligible for the exception from non-accrual, these same loans were again viewed in mid November, 2009. It was noted that the maturity dates remained unchanged indicating that none of the matured loans in the September 30, 2009 sample had been renewed or extended as of mid November.

We recommend that management enhance the process and accounting for maturing/matured loans to ensure that the accounting, process, and policy are consistent.

**Management Response**                                                                 Richard L. Conway

Beginning October 28, 2009, the Bank generated two spreadsheets of commercial loans encompassing the Mid-Atlantic region (DE, PA, MD & NJ). The first list represents loans with maturity dates through December 31, 2009 and the second list with maturity dates from January 1, 2010 through April 30, 2010. The Commercial Lending staff has been instructed that all loans from the first list must be extended,

renewed and/or substantially underwritten with a Change in Terms Agreement in process by December 31, 2009.

The staff was additionally instructed that all loans from the second list must be extended, renewed and/or substantially underwritten with a Change in Terms Agreement by April 30, 2010. The goal of this effort is to eliminate matured loans from the commercial portfolio across the markets and encourage the use of Officer Portfolio by relationship managers and support staff. Officer Portfolio tracks loan maturities 120 days prior to expiration. Oversight and monitoring of the matured/maturing report will be reviewed on a monthly basis by Commercial Loan Management across the four markets.

Distribution List:
Richard L. Conway
Stephen W. Cummings
David R. Gibson
Todd W. Glandon
Anne C. Knapper
Kevyn N. Rakowski
Karen D. Thuresson

Issue Process

A Request for Management Response Memo (RMR) is used to communicate opportunities to improve governance, risk and opportunity management, and controls that need management's input and action plan. Audit Services will then issue a Continuous Auditing Memo (CA) containing the identified issue, management's response and plan, an audit comment, as needed, and a priority rating from the table below.

| Rating | Description |
|---|---|
| Priority 1 | Issue is a very serious and significant control risk that requires immediate attention and is reported immediately to the CEO, COO, CFO, and Audit Committee Chair. The issue may be a material weakness. |
| Priority 2 | Issue is serious and deserves attention by business line executive management within a period reported to the audit committee. The issue may be a significant deficiency. |
| Priority 3 | Issue is serious but does not result in significant exposure. The issue may be a deficiency. |
| Priority 4 | Issue is a "like to have" solution that is of minor risk to the company. The issue is not a deficiency. |

On at least a quarterly basis, updates are obtained on the remediation of outstanding audit issues and issues are assigned a status from the table below. Issue updates and status are communicated to the Audit Committee via an Issue Prioritization Report (IPR). Evidence of issue remediation is needed to support a "Completed" status.

| Status | Description |
|---|---|
| Open | Management has not provided an action plan that adequately addresses the control weakness or risk. |
| Closed | Management has provided an action plan that adequately addresses the control weakness or risk. |
| Completed | Management's action adequately addresses the control weakness or risk. |
| Re-Opened | Management's action is ineffective or unexecuted. |

Confidential

# Wilmington Trust Company
## Waived Loans Managed by Joseph Terranova[1]
### Q3 2009 – Q2 2010

| Quarter | By Count | | | By Balance | | |
|---|---|---|---|---|---|---|
| | All Waived Loans | Terranova Waived Loans | Terranova Waived Loans (%) | All Waived Loans | Terranova Waived Loans | Terranova Waived Loans (%) |
| Q3 2009 | 226 | 83 | 37% | $302 million | $101 million | 33% |
| Q4 2009 | 213 | 104 | 49% | $299 million | $142 million | 48% |
| Q1 2010 | 17 | 0 | 0% | $34 million | $0 million | 0% |
| Q2 2010 | 49 | 0 | 0% | $83 million | $0 million | 0% |

Source: DX-0063; DX-0066; DX-0069; DX-0072; DX-4026

Note:
[1] Waived loans incude only loans that are 90+ days past due; have a Bank number of 1; belong to one of the three ledger categories of commercial, construction, or mortgage; are not in loan recovery; and are waived as "Matured in Process of Renewal," "Matured-Zero Interest Owed/Renewal Extension In Process," "Matured, Interest Current/in Process of Renewal," or "Extension approved, documented and sent for processing."